J-A05003-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PAUL JACKSON HENRY, III | : | |
| | : | |
| Appellant | : | No. 1532 MDA 2020 |

Appeal from the Judgment of Sentence Entered June 5, 2020
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0006562-2016

BEFORE:   OLSON, J., KUNSELMAN, J., and STEVENS, P.J.E.*

MEMORANDUM BY OLSON, J.:                **FILED: JULY 25, 2022**

Appellant, Paul Jackson Henry, III, appeals from the judgment of sentence entered on June 5, 2020, following his jury trial convictions on two counts of first-degree murder and one count of robbery.[1]  Upon careful review, we affirm.

The trial court summarized the facts of this case as follows:

On September 13, 2016, Trooper Seth Heffner was dispatched to [a residence on] Brown Road in Fawn Township, York County, Pennsylvania, for an active home invasion.  Trooper Heffner and another officer responding from another police [department] made entry [into the residence] through an open door into a living

---

* Former Justice specially assigned to the Superior Court.

[1]  18 Pa.C.S.A. §§ 2502(a) and 3701(a)(1)(ii), respectively.  Although Appellant purports to appeal from the guilty verdict rendered on May 24, 2018, the appeal lies from the judgment of sentence entered on June 5, 2020, following resentencing as described in detail below.  ***See Commonwealth v. O'Neill***, 578 A.2d 1334, 1335 (Pa. Super. 1990) ("[I]n a criminal cases appeals lie from judgment of sentence rather than from the verdict of guilt.").

room. The trooper proceeded with the other responding officers to clear the house. Passing through a kitchen area and moving towards the back of the house[,] they discovered [(in a back room)] a [deceased] black male[, later identified as Foday Cheeks,] with a gunshot wound to the head. The trooper then observed a [deceased] white female[, later identified as Danielle Taylor,] in [a room described by witnesses as a] mudroom.

Trooper Matthew Kabacisnski, testified that he and Trooper Dominic Fresco responded to the scene, for a home invasion with, possibly, shots fired within the home. Trooper Kabacisnski stated that he found a bullet casing [inside a flower pot] outside of the back door of the residence[.]

Amy Eller testified as to having been a former heroin and cocaine user who had, prior to the incident, dated the victim, Foday Cheeks, who was like a stepfather to her son, James Gregoire. Eller would visit Cheeks at the Brown Road residence to utilize the washing machine and let her son visit with Cheeks.

On the date of the incident, Eller took her son and his friend Devon Fisher to Cheeks' residence to wash clothes. Two women Eller knew only as acquaintances, Danielle [Taylor] and Coren [Clymer], were at the residence. Eller testified to being clean from drugs on the date in question.

At some point, Veronique Henry called and Cheeks told her not to stop by unless she had his money and then Cheeks said he would see her when she arrived. Eller stated that within a half an hour, perhaps less, there was a knock at the door. Devon Fisher moved to answer it when Cheeks told him to allow one of the [women] to do so. Danielle Taylor, who had been cooking, went to the door and Eller heard a loud pop, almost like a firecracker. Cheeks arose to check and did not even make it around the corner before [Appellant] came around the corner and started shooting.

Eller testified that she saw [Appellant] shooting. Cheeks was protesting and moving to get the gun from [Appellant]. Veronique entered behind [Appellant] and [just watched] Eller and the others and point[ed] for them to stay to the side. Eller stated that she could see [Appellant] shooting from her position on the couch. [Appellant] and Cheeks moved towards the back of the house while Veronique, standing with her gun trained on the others, speaking only to Eller and the children, instructed them to lie on the floor. [Appellant then asked] if there [were] drugs or money in the house as he began to run around the house, including up

and down the stairs. Eller testified that Veronique whispered not to move around and that she would not allow [Appellant] to kill the kids. [Appellant] informed Eller that she was a piece of shit for having her kids at a heroin dealer's home. [Appellant] then left Veronique with the survivors [and Eller testified that Appellant] "went back in and then there was another shot, and that was the last one I heard." [Appellant and Veronique] then took Eller's purse, which contained her Suboxone[2] and wallet, and the survivors' [cellular tele]phones.

James Gregoire testified that he was fourteen at the time of the shootings. He confirmed that his mother had been doing laundry while he, his friend, and Cheeks played videogames. James also confirmed that his friend Devon attempted to answer a knock at the door, but Cheeks said to let [one of the women get the door]. When the door was answered, James heard a loud shot. James testified that instantly after that the man ran in and shot Cheeks. Cheeks had sprung up when they heard what James initially mistook for a firecracker. Cheeks ran toward the kitchen, but when he got to the end of the living room he was shot.

James testified [that he saw the male perpetrator discharge his firearm] and that the [female] who was with [him] came in a couple of seconds [later]. James stated that the female held the survivors at gunpoint, but that she did not [fire any rounds]. James testified that the female stated that they would all be fine as only Cheeks was getting shot and that the male was screaming violently about how children should not be brought to a drug dealer's house. James testified to suffering from Steven Johnson syndrome, which caused him, by the time of trial, to be blind in his right eye. James also stated that his vision was better in September of 2016 and noted that he was playing video games at the time and could, still, at the time of trial, see the screen and play games if he chose to do so.

Coren Clymer testified [similarly to] Eller and James Gregoire about Cheeks not even making it to the kitchen before [Appellant shot him]. Clymer admitted to using heroin on the morning of the incident.

Devon Fisher testified that he was seventeen years old at the time of the shooting. He stated that the shooter was a white male who was probably in his late thirties and who had facial hair. When

---

[2] A medication used for opiate disorder treatment.

asked if he had a clear view[, Devon confirmed that the male perpetrator discharged his firearm and that he] never saw the female shoot a gun.

Trial Court Opinion, 2/16/2021, at 5-9 (record citations and most titles omitted).[3]

Appellant testified on his own behalf at trial. He stated that Veronique had a substance abuse problem, entered Cheeks' residence armed and, initially, by herself, and that she was the lone shooter once inside. Appellant testified he ran into the residence with a gun drawn only after he heard gunshots. Appellant attested that when he entered the residence, he saw a female who had been shot on the floor and Cheeks stumbling towards him before collapsing in a bedroom. Appellant testified that he exchanged firearms with Veronique, told the minor witnesses to collect the survivors' cellular telephones, saw Veronique looking for narcotics in the couch, and then fled with her and the cellular telephones. *Id.* at 9-11.

On May 22, 2018, a jury convicted Appellant of two counts of first-degree murder and one count of robbery. On May 24, 2018, a jury returned death sentences for both counts of first-degree murder. The trial court imposed a consecutive sentence of 10-20 years of imprisonment for robbery. Upon joint stipulation, however, the Commonwealth and Appellant

_____

[3] We note that the trial court opinion identifies Amy Eller as both "Eller" and "Ellers." From our review of the record, the witness spells her last name as "Eller" and we use that spelling throughout the memorandum. Moreover, the trial court opinion refers to all of the witnesses by their last names, except for the minor children and Veronique Henry who are referred to by their first names. For consistency, we do the same.

agreed that the jury had disregarded instructions regarding mitigation evidence. Accordingly, the trial court held resentencing hearings. On June 5, 2020, the trial court vacated the original sentence and imposed two consecutive terms of life imprisonment for the two counts of first-degree murder with a consecutive term of 10 to 20 years of incarceration for robbery. On June 15, 2020, Appellant filed a post-sentence motion. After hearings on Appellant's post-sentence motion, the trial court denied relief by order and accompanying opinion entered in open court on November 6, 2020. This timely appeal resulted.[4]

On appeal, Appellant presents the following issues[5] for our review:

> A. Whether the trial court abused its discretion when it made certain evidentiary rulings, granted certain motions, and denied [] Appellant's [p]ost[-s]entence [m]otion?
>
> B. Whether the jury acted improperly throughout the trial[?]
>
> C. Whether the Commonwealth committed prosecutorial misconduct[?]

_____

[4] Appellant filed a notice of appeal on November 4, 2020. On December 8, 2020, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied timely on December 28, 2020 and the trial court issued a written opinion pursuant to Pa.R.A.P. 1925(a) on February 16, 2022. The court confined its February 2022 opinion to issues that Appellant first raised in his concise statement and which were not examined in open court on November 6, 2020, at the conclusion of the hearing on Appellant's post-sentence motion.

[5] We have reordered Appellant's issues for ease of discussion.

D. Whether the jury's verdict was against the weight of the evidence?

Appellant's Brief at 7.

In the first issue we examine on appeal, Appellant challenges various evidentiary rulings made by the trial court before, during, and after trial. As we examine each contention in turn, we shall adhere to the following standards:

> The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. Our standard of review of a challenge to an evidentiary ruling is therefore limited. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Herring*, 271 A.3d 911, 918 (Pa. Super. 2022) (citation and original brackets omitted).

Appellant claims that the trial court erred in denying his pre-trial request to bifurcate his trial "into two separate trials [] with two separate juries, one to determine guilt or innocence and one[,] if necessary[,] to determine life or death." Appellant's Brief at 43. Appellant argues that the single jury that decided his case was distracted during the guilt phase of trial because, in the absence of bifurcation, the jury was prejudiced knowing that the Commonwealth sought the death penalty or, alternatively, the jury was preoccupied with the possibility of deciding between life or death as Appellant's punishment. *Id.* He claims that "at least one, if not three, jurors were so preoccupied with the penalty phase prior to the conclusion of trial

- 6 -

testimony, hearing closing arguments and receiving instructions from the [c]ourt, they inquired with [court personnel] as to when [] the penalty phase of the trial" would begin. *Id.* at 44. Appellant claims that the trial court further erred by failing "to identify or colloquy the jury members" allegedly involved, which "prevented [the] defense from being able to, at a minimum, request [] juror replacement, and possibly request a mistrial[.]" *Id.* at 60; *see also id.* at 75-76. Appellant asserts that the trial court further erred by not allowing the defense to present subpoenaed court staff to testify regarding the purported jury misconduct. *Id.* at 61; *see also id.* at 76. As a result of the foregoing allegations of error, Appellant contends that he "was deprived of a fair trial and due process during the guilt phase of trial." *Id.* at 46.

Our Supreme Court has previously determined:

> The Sentencing Code provides that "[a]fter a verdict of murder of the first degree is recorded and before the jury is discharged, the court shall conduct a separate sentencing hearing in which the jury shall determine whether the defendant shall be sentenced to death or life imprisonment." 42 Pa.C.S.A. § 9711(a)(1). [Our Supreme] Court has repeatedly interpreted Section 9711(a)(1) as providing that "the same jury which renders the verdict of murder in the first degree is the same jury which is to determine whether the sentence is to be death or life imprisonment."

*Commonwealth v. Mattison*, 82 A.3d 386, 397 (Pa. 2013) (internal case citations omitted). As such, we reject Appellant's suggestion that the trial court erred by failing to empanel two separate juries for the guilt and penalty phases of his trial.

Moreover, "[i]t is within the discretion of the trial court to determine whether a defendant has been prejudiced by [juror] misconduct or impropriety to the extent that a mistrial is warranted." *Commonwealth v. Brown*, 786 A.2d 961, 972 (Pa. 2001) (citation omitted). Here, during deliberations and before rendering a verdict, the jury sent a note to the trial court asking, *inter alia*, when the jury would decide Appellant's penalty. The trial court called the jury into the courtroom and issued the following statements:

> [T]here was a question asked of one of my tipstaffs regarding the penalty phase. We don't get to the penalty phase until there's a verdict returned. Until a verdict of first[-]degree [murder] is returned, we don't get to the penalty phase. If there isn't a verdict of [] first[-]degree [murder], then we don't move to the penalty phase.
>
> But at this point you should be focused on guilt or innocence and deciding whether or not the Commonwealth has proven the defendant guilty of any of the crimes charged beyond a reasonable doubt, so I'd ask you just to focus your attention on that.
>
> And I know this is somewhat of a confusing process, it is not something you do every day, but just trust me. I will sort of take you there one step at a time. The first step is to resolve the questions of guilt[] or innocence.

N.T., 5/14/2018, at 1584-1585. "It is well settled that the jury is presumed to follow the trial court's instructions." *Commonwealth v. Vucich*, 194 A.3d 1103, 1113 (Pa. Super. 2018) (citation omitted). In addition, Appellant did not object to the instructions given nor did he request a mistrial based upon juror misconduct. Accordingly, upon review of the certified record and applicable law, we conclude that the trial court did not abuse its discretion in rejecting Appellant's claim alleging juror misconduct.

Next, Appellant argues that "the trial court abused its discretion when it made a ruling regarding the deceased co-defendant's statement." Appellant's Brief at 47. Appellant's Brief at 47. Appellant explains:

[T]he co-defendant, Veronique Henry, committed suicide[6] on or about September 15, 2016 in the York County Prison after being arrested and charged with offenses related to the incident that [Appellant] was charged with in this case.

Initially, there was a discussion about a stipulation between [d]efense counsel and the Commonwealth. Counsel for [Appellant] wanted the jury to be made aware that Veronique Henry took her [own] life [because counsel planned to argue that her suicide demonstrated] consciousness of guilt. (Specifically, that she was the person who did the shooting and that is why she committed suicide[.])

The Commonwealth argued that evidence of [Veronique] Henry's suicide was inadmissible. The Commonwealth further argued that if evidence of her suicide was admitted, they would seek to introduce the statement[s] she gave to the police after being arrested and prior to her suicide. [Veronique] Henry gave two statements to the police on September 14, 2016. In her statements, [Veronique] Henry, among other things, claimed [Appellant] did the shooting.

Counsel for [Appellant] argued there was a confrontation issue regarding [Veronique] Henry's statement[s] and further argued it was a separate issue, because there was no dispute that she committed suicide. Counsel for [Appellant] argued that when [Veronique] Henry made her statement[s], she had her own interest in mind since she was also [] charged. [The statements were] self-serving [] and the defense would have no way to

_____

6 By joint stipulation, the jury was simply told that police detained and arrested Veronique Henry who was apprehended in a vehicle with Appellant, that the Commonwealth charged her with homicide, robbery and related charges, and that she died while incarcerated at the York County Prison. N.T., 5/14/2018, at 1205.

confront [Veronique] Henry regarding her statements because she was no longer alive.

[Appellant] takes the position that [Veronique] Henry's statements are clearly hearsay and do not fall within any of the hearsay exceptions[, even though he] concedes that [Veronique] Henry meets the definition of an unavailable witness under Pa.R.E. 804(4) [because she was dead].

*Id.* at 47-49 (record citations omitted). Appellant maintains, however, "that the trial court erred and abused its discretion when it ruled that the Commonwealth could introduce [Veronique] Henry's statements to the police if the defense brought in evidence of her suicide" and he is entitled to a new trial, as a result. *Id.* at 52.

From our review of the record, we note the following. In his omnibus pretrial motion, Appellant sought to "preclude any and all statements made by co-conspirator Veronique Henry, while in police custody." Omnibus Pretrial Motion, 5/15/2017, at 7, ¶ 42. The trial court held pretrial hearings, in morning and afternoon sessions, on August 22, 2017. In the morning session of the pretrial hearing, counsel for Appellant acknowledged that he "worked out an agreement with regard to any statement made by Veronique Henry" and that the Commonwealth "informed [Appellant] that they [did] not intend to introduce [the statements] unless the door [was] opened by [the] defense" with evidence that Veronique Henry committed suicide. N.T. (morning session), 8/22/2017, at 3. The Commonwealth agreed that "if for some reason the Commonwealth feels that is the case, that the door has been opened, [the Commonwealth would] notify defense counsel and the court so

[the parties] could address it at that point" to allow for argument. *Id.* at 3-4. At an afternoon session of the pretrial hearing on August 22, 2017, the trial court recognized that "[a]s to the motion *in limine* regarding [Veronique] Henry's statement[s] to police, the Commonwealth has agreed that they have no intention of using those statements unless the defense opens the door" with evidence of her suicide. N.T. (afternoon session), 8/22/2017, at 13. As such, the trial court "reserved [any further rulings for] the time of trial." *Id.*

The parties raised the issue again during jury selection. Appellant and the Commonwealth could not agree on a stipulation of facts regarding Veronique Henry's death in prison. More specifically, the "Commonwealth [took] issue with [the portion of the stipulated statement that] Veronique Henry took her own life." N.T., 5/7/2018, at 157. The parties argued their respective positions. Appellant asserted that he wanted to enter evidence of Veronique Henry's suicide as consciousness of her guilt. The Commonwealth argued that if the trial court permitted evidence of her suicide, it should be permitted to introduce various statements she made to police implicating Appellant as the lone shooter to rebut Appellant's consciousness of guilt argument. The trial court responded that it was inclined to allow the defense to introduce evidence of Veronique Henry's alleged suicide and for the Commonwealth to introduce her statements to police as rebuttal. *Id.* at 167. Ultimately, however, the trial court reserved ruling on the issue until defense counsel proffered the evidence at trial. *See id.* at 168 ("I think once you raise that issue, I think they are permitted to rebut it.").

At trial, the following exchange occurred:

[DEFENSE COUNSEL]: Your Honor, at this time I think it would be appropriate to enter into the stipulation that we have, the Commonwealth and ourself, and I've marked it actually as Defendant's Exhibit 93.

The stipulation is that --

THE COURT: Before you do that, counselor, let me just -- all right, ladies and gentlemen, I've said this to you before and I'll probably give you the cautionary instruction again, maybe more than once before the end of the trial, but the statements made by the attorneys, by counsel, are not evidence and they are not binding on you.

Now, there are some exceptions to this, and one of those exceptions is stipulated facts. And we've had some of these at other parts in the trial and I've advised you then I'll advise you again that when the district attorney and counsel for the defendant stipulate, that is when they agree that a certain fact is true, their stipulation is evidence of that fact. You should regard the stipulated fact as having been proven. All right?

Now, [counsel for Appellant], you wished to place the stipulation into the record?

[DEFENSE COUNSEL]: Yes, Your Honor. Thank you. You have heard the name Veronique Henry mentioned during the trial. However, you have not heard directly from Veronique Henry. It is alleged by the Commonwealth that Veronique Henry was at [the residence in question], Fawn Township, York County, on September 13, 2016.

It is also alleged by the Commonwealth that Ms. Henry was in the vehicle with [Appellant] on September 14, 2016 when the vehicle was stopped by the state police on Route 322. Veronique Henry was detained, arrested and charged with homicide, two counts, burglary, robbery, criminal conspiracy to commit homicide, aggravated assault, two counts, simple assault, four counts, and theft, two counts, on September 14, 2016.

After being charged, Ms. Henry was incarcerated on September 14, 2016 in the York County Prison. On September 15, 2016,

- 12 -

> Veronique Henry died while incarcerated in the York County Prison.
>
> THE COURT: All right, ladies and gentlemen. Again, you may accept those facts as if they had been proven in court. It's a stipulation that both parties agree to. All right.

*Id.* at 1205-1206.  From our review of the record, at no time did Appellant attempt to introduce evidence at trial that Veronique Henry's death was a suicide.

Here, the trial court never made a ruling on the record that pertained to any of the foregoing proffered evidence.  Appellant suggests that the trial court erred in making a conditional ruling.  However, Appellant never formally proffered evidence of Veronique Henry's suicide.  Quite simply, the trial court neither excluded proof of Veronique Henry's purported suicide nor allowed the Commonwealth to admit Veronique Henry's statements to police at trial.  Without testing or challenging the trial court's conditional pronouncements, as there was never a formal proffer of evidence by Appellant (or the Commonwealth), the trial court did not make a final decision on these evidentiary issues.  "The courts in our Commonwealth do not render decisions in the abstract or offer purely advisory opinions."  **Pittsburgh Palisades Park**, **LLC v. Commonwealth**, 888 A.2d 655, 659 (Pa. 2005).  Moreover, Appellant entered the above-quoted stipulation and the trial court admitted "defense exhibit 93," Appellant's own written stipulation, into the record.   The stipulation of facts is binding upon the court and the parties. **See Commonwealth v. Mitchell**, 902 A.2d 430, 460 (Pa.2006). "A stipulation is

a declaration that the fact agreed upon is proven, and a valid stipulation must be enforced according to its terms." *Id.* A "jury [is] bound by [a] stipulation." *Id.*

We discern no abuse of discretion by the trial court. Here, Appellant did not proffer evidence at trial that Veronique committed suicide as consciousness of her guilt and, thus, the trial court did not preclude such evidence. The Commonwealth never sought to introduce Veronique's statements to the police into evidence. Instead, Appellant entered into a stipulation that Veronique simply died in prison. Appellant is bound by that stipulation. Neither the trial court nor this Court may engage in speculation, or offer what would amount to an advisory opinion, regarding whether evidence of Veronique's suicide or her statements to police were admissible at trial. As such, Appellant is not entitled to relief on this claim.

With regard to his final evidentiary challenges, Appellant argues that the trial court abused its discretion when, during trial, it: (1) denied his request to remove Juror No. 450 for cause when the juror stated that he "would do his best" to follow the court's instructions on life and death, *see* Appellant's Brief at 53; (2) "improperly granted [Commonwealth] objections, overruled [Appellant's] objections and struck testimony from the record" when defense counsel attempted to highlight inconsistent statements made by Eller, *see id* at 53-55; (3) permitted the "Commonwealth firearms expert to testify as to opinions beyond the scope of the expert[']s report over defense[']s objection," *see id.* at 55; (4) chastised and commented on defense counsel's line of

questioning in front of the jury, **see id.** at 55-56, and; (5) admitted four photographs of the two decedents into evidence where "the photographs were inflammatory and did not have any essential evidentiary value." **See id.** at 56-59.

Of these evidentiary sub-issues, Appellant only supports one with legal citation to authority, namely his claim pertaining to the introduction of photographs at trial. This Court has previously determined:

> it is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities. Citations to authorities must articulate the principles for which they are cited.

> This Court will not act as counsel and will not develop arguments on behalf of an appellant. Moreover, when defects in a brief impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived.

**Commonwealth v. Hardy**, 918 A.2d 766, 771 (Pa. Super. 2007) (internal case citations omitted), *citing* Pa.R.A.P. 2119 and 2101. Accordingly, we find that Appellant has waived appellate review of the first four of his enumerated evidentiary claims as set forth above.[7]

---

[7] Regardless, the trial court analyzed the first of these two claims and determined them to be meritless. The trial court rejected Appellant's claim that Juror No. 450 was not removed for cause because defense counsel cross-examined the juror at length during *voir dire*, Juror No. 450 said he would do his best to remain impartial, and, therefore, the trial court found that the record did "not indicate that the challenged juror had formed a fixed opinion regarding guilt or innocence." Trial Court Opinion, 11/6/2020, at 20. *(Footnote Continued Next Page)*

With regard to the photographs entered into evidence, Appellant argues it was unnecessary "to use four photographs that showed the two deceased victims" because they "were inflammatory and did not have any essential evidentiary value." Appellant's Brief at 57-58. Appellant contends that there were already many other crime scene photographs entered into evidence, there was no dispute the victims were shot and nothing unique about the shooting or injuries that required juror viewing, and a diagram would have been just as accurate. *Id.* at 59. Appellant claims that although the trial court gave the jury a standard cautionary instruction regarding photographs, he was still prejudiced. *Id.*

Our Supreme Court has stated:

_____

Moreover, the trial court determined that Appellant failed to establish prejudice because defense counsel did not exhaust his preemptory challenges to jurors and could have asked to have Juror No. 450 removed on this basis but did not. *Id.* at 21. Regarding Eller's supposed inconsistent statements, the trial court recognized that defense counsel cross-examined Eller extensively about purported inconsistent statements and concluded that "[a]ny potential inconsistency was on full display for the jury and the inconsistency does not seem substantial, nor even material to the issue – as it merely related to background about everyday activities that occurred prior to the [occurrence] of the grossly abnormal double murders." *Id.* at 31. We discern no abuse of discretion in these rulings. Finally, Appellant failed, in his Rule 1925(b) concise statement, to specifically challenge the scope of the testimony offered by the Commonwealth's firearms expert or the conduct of the trial court in chastising and commenting upon defense counsel's examinations before the jury. Thus, the trial court did not address those issues in its subsequent Rule 1925(a) opinion. We find these two claims waived for this reason. *See Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) ("Any issues not raised in a 1925(b) statement will be deemed waived."); *see also* Pa.R.A.P. 1925(b)(vii) ("Issues not included in the [s]tatement […] are waived").

- 16 -

photographic evidence of a murder victim is not *per se* inadmissible; instead, the admissibility of photographic evidence depicting a murder victim involves a two-part analysis. The court must first determine if the photograph is inflammatory and then, if it is, the court must apply a balancing test to determine whether the photograph is of such essential evidentiary value that its need clearly outweighs the likelihood of inflaming the minds and passions of the jury.

**Commonwealth v. Knight**, 241 A.3d 620, 642 (Pa. 2020) (citation and quotations omitted). "[I]t is generally the manner in which a corpse is displayed that causes photographs to be emotionally charged." **Commonwealth v. Petrakovich**, 329 A.2d 844, 849 (Pa. 1974). "In the trial of criminal cases photographs of the victim and of the scenes of the crime are admissible to aid the jury in their understanding of the alleged crime, the kind of crime it was, exactly what caused the victim's death and what, if any connection defendant had with it." **Id.**, *citing* **Commonwealth v. Robinson**, 249 A.2d 536, 538 (Pa. 1969). "The availability of alternate evidence[,] does not obviate the admissibility of photographs[.]" **Commonwealth v. McCutchen**, 454 A.2d 547, 550 (Pa. 1982).

Here, the trial court determined that the challenged photographs were not inflammatory, and that the Commonwealth had the right to introduce them to prove its case. Trial Court Opinion, 11/6/2020, at 22-26. The trial court noted that the photographs at issue were black and white (not color), did not depict close-ups of the decedents, and the angles of the photographs obscured much of the blood. **Id.** at 24. As such, the court concluded that the photographs were not inflammatory. We agree with the trial court's

- 17 -

assessment. Moreover, the trial court determined that the photographs were relevant to explain the positioning of the bodies and to assist the jury in understanding that Appellant began firing his gun before entering the house and that he moved Cheeks' body afterwards. *Id.* at 25. Again, we discern no abuse of discretion. It was permissible to allow the Commonwealth to admit photographs of the victims and the scene of the crime to aid the jury in understanding what caused the victims' deaths, Appellant's connection to the victims, and to rebut potential defenses to the charges. The Commonwealth was not required to use a diagram instead of the photographs. Accordingly, we discern no abuse of discretion by the trial court in admitting the photographs into evidence. For all of the foregoing reasons, Appellant's first appellate issue examined fails.

In the second appellate issue as set forth above, Appellant posits that the trial court erred by denying his claim that the jury pool was not selected randomly and that certain jurors acted improperly during jury selection and throughout trial. *See* Appellant's Brief at 61-79. More specifically, Appellant claims the jury pool was not randomly selected because it "consisted of the first 100 jury members to arrive at the jury room." *Id.* at 61. Appellant "believe[s] that the jury pool [] was selected prior to the time that the jury members were even required to report to the courthouse." *Id.* at 63. Furthermore, pointing to "an expert witness in psychology and neuroscience" who testified at the hearing on Appellant's post-sentence motion, Appellant claims his jury pool was not random, but was instead a convenient or

haphazard sample, did not represent the greater population, and consisted of "people who arrive on time or early to an appointment [and] tend to be conscientious, organized or deliberate, more agreeable, more empathetic, modest [and] compliant." *Id.* at 63-64. In addition, Appellant maintains that "at least [two] of the jurors had some extraneous influence" despite "acknowledg[ing he does not know] what information the jurors had during trial." *Id.* at 74.

"All persons entitled to a jury trial in a civil action or criminal proceeding shall have the right to jurors selected at random from a representative cross section of the eligible population of the county." 42 Pa.C.S.A. § 4501. "A jury panel for the trial of any case may be challenged only on the grounds that it was not selected at random from the array." 42 Pa.C.S.A. § 4526(e). "Such challenge must be made by a party immediately after the panel of jurors has been selected by the administrative staff of the court and before interrogation of jurors commences." *Id.* "[E]rrors and omissions in the selection of jurors [] shall not constitute grounds to set aside any jury verdict in any civil or criminal matter or to arrest, reverse, open or strike any judgment entered on a jury verdict, and the trial by jury and its rendition of a verdict in any matter shall constitute a waiver of all such errors and omissions." 42 Pa.C.S.A. § 4527.

Upon review, Appellant waived his claim pertaining to the selection of the jury pool. Appellant did not challenge the random designation of the jury pool after selection by the administrative staff but before *voir dire*

- 19 -

commenced, as required under Section 4526(e). Moreover, after the jury rendered its verdict, any purported errors pertaining to the selection of jurors was waived by Appellant under Section 4527. For both of these reasons, Appellant waived his current claim. Moreover, as Section 4527 makes clear, Appellant is not entitled to a new trial for the alleged error. As such, Appellant is not entitled to relief.

Next, Appellant claims that the Commonwealth engaged in prosecutorial misconduct for failing to preserve specific evidence and making an impermissible religious reference during closing argument. Appellant's Brief at 79-85. We will examine the allegations pertaining to evidence preservation first. Initially, Appellant maintains that the Commonwealth "failed to preserve the original call to 911 [] Eller made after the shooting[.]" *Id.* at 80. Second, Appellant argues the Commonwealth failed to preserve a diagram of the scene that was hand drawn by Devon Fisher while he was being interviewed by the police. *Id.* at 80-81. Appellant "contend[s] this diagram was exculpatory and would have contradicted other witnesses' statements" and shown "that the witnesses could not see who was shooting because of their location." *Id.* at 81. Third, Appellant maintains that although "the police testified [at trial] that they did not use trajectory rods during the investigation at the scene[,]" crime scene police photographs showed otherwise. *Id.* at 82. Fourth, Appellant asserts that despite the Commonwealth's denial that the police used "[e]vidence marker [number] 10 at the scene," crime scene police photographs showed otherwise. *Id.* at 83. Appellant claims that, at a

minimum, the evidence allegedly withheld pertaining to aforementioned claims of prosecutorial misconduct "shows that the police were not being careful with the evidence" and "further show[s] the Commonwealth's attempt to disable the defense theory." *Id.* Appellant contends the Commonwealth was in control of the aforementioned evidence and he "was prejudiced by the disappearance and unavailability" of the evidence for trial. *Id.* at 85.

Our standard of review "for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion." *Commonwealth v. Hernandez*, 230 A.3d 480, 490 (Pa. Super. 2020) (citation omitted). We have previously determined:

> Prosecutorial misconduct includes actions intentionally designed to provoke the defendant into moving for a mistrial or conduct by the prosecution intentionally undertaken to prejudice the defendant to the point where he has been denied a fair trial.
>
> *          *          *
>
> A fair trial, of course is not a perfect trial. Errors can and do occur. That is why our judicial system provides for appellate review to rectify such errors. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied. A fair trial is not simply a lofty goal, it is a constitutional mandate, and where that constitutional mandate is ignored by the Commonwealth, we cannot simply turn a blind eye[.]"

*Commonwealth v. Culver*, 51 A.3d 866, 883 (Pa. Super. 2012) (internal citations and quotations omitted).

Moreover, our Supreme Court has held:

> Under *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] and the decisional law it has spawned, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or

- 21 -

punishment of an accused, including evidence of an impeachment nature.  Thus, to establish a ***Brady*** violation, an accused must prove three elements:

> the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued.

The evidence allegedly withheld must have been material evidence that deprived the defendant of a fair trial.  Favorable evidence is material, and constitutional error results from its suppression by the government if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. [Our Supreme] Court [] discussed further how the materiality standard in essence defines the prejudice element of a ***Brady*** violation, as follows:

> In determining whether a reasonable probability of a different outcome has been demonstrated, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A reasonable probability of a different result is shown when the government's suppression of evidence undermines confidence in the outcome of the trial.  The United States Supreme Court has made clear that [the] materiality standard is not a sufficiency of the evidence test.  A ***Brady*** violation is established by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.  Importantly, the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense.

Finally, the burden rests with an appellant to prove, by reference to the record, that evidence was withheld or suppressed by the prosecution.

***Commonwealth v. Hutchinson***, 25 A.3d 277, 310 (Pa. 2011) (internal citations, quotations, and original brackets omitted).

Here, the trial court noted that the claims pertaining to the missing minutes from the 911 call, hand-drawn diagram, evidence marker number 10, and police use of trajectory rods were placed squarely before the jury.  Trial Court Opinion, 11/6/2020, at 11-12.  Counsel for Appellant conducted extensive and thorough cross-examination of various witnesses regarding the allegedly missing evidence.[8]  *Id.*  Defense counsel also highlighted the reportedly missing evidence during closing argument on behalf of Appellant. *Id.*  Additionally, the trial court noted that, upon Appellant's request, the court gave the jury an adverse inference instruction[9] due to the Commonwealth's failure to produce the entire 911 call or the hand-drawn diagram of the residence.  *Id.*  "It is well settled that the jury is presumed to follow the trial court's instructions."  *Commonwealth v. Vucich*, 194 A.3d 1103, 1113 (Pa. Super. 2018) (citation omitted).  Taken together, Appellant has not shown

---

[8]  We reject Appellant's suggestion that the Commonwealth withheld evidence pertaining to the police use of trajectory rods during their investigation.  At trial, one of the investigating officers testified that she only used trajectory rods to determine the angles of some of the bullet holes, because the rods were simply not long enough.  N.T., 5/7/2018, at 1286-1287.  Likewise, upon review of the record, the police used marker number 10 to denote an end table next to a sofa.  N.T., 5/14/2018, at 67-68.  As such, we conclude that the Commonwealth did not withhold this information from Appellant.

[9]  *See*, *i.e.*, *Commonwealth v. Miller*, 172 A.3d 632 (Pa. Super. 2017) (when non-cumulative, material evidence is in control of one party and not produced to the other, the trial court may give an adverse inference instruction directing that "the jury may draw an inference that [the evidence] would have been unfavorable").  "It is well settled that the jury is presumed to follow the trial court's instructions."  *Commonwealth v. Vucich*, 194 A.3d 1103, 1113 (Pa. Super. 2018) (citation omitted).

- 23 -

how he was prejudiced or how the alleged evidence could reasonably cast the entire case in a different light so as to undermine confidence in the verdict. Appellant is not entitled to relief on his claim that the Commonwealth engaged in prosecutorial misconduct by withholding material evidence.

Finally, we address Appellant's prosecutorial misconduct argument pertaining to the Commonwealth's closing argument. Appellant argues that the Commonwealth made an impermissible religious reference during closing argument, when "the District Attorney said, 'My God, Imagine….'" *Id.* at 83. We have previously determined that

> prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Prosecutorial misconduct is evaluated under a harmless error standard.
>
> *             *             *
>
> In determining whether the prosecutor engaged in misconduct, we must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's conduct. It is well settled that the prosecutor may fairly respond to points made in the defense closing. Moreover, prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair.

*Commonwealth v. Judy*, 978 A.2d 1015, 1020 (Pa. Super. 2009) (internal citations omitted).

Additionally, while our Supreme Court has noted that there is a *per se* prohibition against the prosecution making biblical references during penalty phase argument, the Court "has not imposed a rule mandating automatic

reversal when a prosecutor refers to religion during closing arguments." ***Commonwealth v. Natividad***, 938 A.2d 310, 325 (Pa. 2007). Instead, "where the prosecutor reference[s] God during guilt-phase closing arguments, [the appellant must prove] that the statements prejudicially impacted his convictions." ***Id.*** Ultimately, the ***Natividad*** Court concluded that the Commonwealth's passing reference to God during its guilt-phase closing argument was not prejudicial and did not influence the convictions in that matter. ***Id.***; ***see also Commonwealth v. Chmiel***, 777 A.2d 459, 466 (Pa. Super. 2001) ("[O]ur Supreme Court has narrowly tolerated references to the Bible and other religious invocations and has characterized such references as 'oratorical flair'" but "has cautioned that such references are a dangerous practice that is strongly discouraged.").

Here, the trial court noted that "[t]he sum total of the religious reference was a passing 'My God'" during closing argument and that the Commonwealth did not "appeal to guidance or favor from a deity." Trial Court Opinion, 11/6/2020, at 14. Upon review, we agree. The Commonwealth used the term "My God" during closing argument, a single time, as oratorial flair. Appellant has not proven that the lone statement prejudicially impacted his convictions. As such, we conclude that the trial court did not abuse its discretion in rejecting Appellant's assertion that the Commonwealth engaged in prosecutorial misconduct during closing argument. Accordingly, Appellant's third appellate issue is without merit.

Finally, we address Appellant's challenge that the verdict was against the weight of the evidence. The Pennsylvania Supreme Court has determined:

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, [our Supreme Court has] explained:

The term discretion imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (internal citations and quotations omitted).

Initially, in ruling on post-sentence motions, the trial court briefly addressed Appellant's weight of the evidence claim in its opinion and order dated November 6, 2020. The trial court noted that there were eyewitnesses who identified Appellant as the shooter and that "physical evidence of a shell casing found outside" refuted Appellant's claim that his wife and co-defendant, Veronique, began shooting once inside the residence. Trial Court Opinion, 11/6/2020, at 5-6. The trial court determined that the verdict, therefore, did not shock the conscious of the court. *Id.* at 6. In its subsequent opinion, the trial court noted:

> [**F**]**our** eyewitness survivors identified [Appellant] directly, or [] described the male assailant as the shooter. Admittedly, one witness was a recovering addict and another witness actively used [narcotics] on the fateful day. One witness suffers from degenerative [eye] disease; however, critically, he testified to being able to play videogames then and at the time of trial [] which speaks to his eyesight [and he testified to not] using drugs or having any issues with his eyesight and he identified the male assailant as the shooter. There was but one male assailant.
>
> *                    *                    *
>
> Four eyewitnesses were able to give remarkably detailed accounts that differed only in the sort of details one would expect to differ in an incredibly harrowing event perceived by four distinct souls focused intently on their own survival. Moreover, [Appellant's] story was not credible where he stated the shooting began within the house and, yet, an ejected shell casing was found outside of the house.

Trial Court Opinion, 2/16/2021, at 17-18 (emphasis in original).

Based upon our limited standard of review, as set forth above, we discern no abuse of discretion in ruling on Appellant's weight of the evidence claim. Because the trial court has had the opportunity to hear and see the

- 27 -

evidence presented, we give the gravest consideration to its findings and reasons advanced. Here, the trial court determined that the verdict did not shock its conscious based upon the overwhelming eyewitness testimony and supporting physical evidence. As such, Appellant's weight of the evidence claim fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/25/2022